Filed 2/11/14  P. v. Caldera CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MANUEL ANDRES CALDERA,<br><br>    Defendant and Appellant. | A133906<br><br>(Contra Costa County<br>Super. Ct. No. 1004720) |

Manuel Caldera was found competent to stand trial and convicted of multiple forcible sex offenses against five victims.  He contends the trial court committed reversible error when it allowed the prosecutor to question an expert psychiatric witness in front of the jury about the consequences of an incompetency verdict and later refused to suspend the proceedings for a second competency evaluation.  He also contends the court erred when it refused to sever the counts concerning one of his victims for a separate trial, and when it imposed consecutive sentences on all counts.  None of defendant's contentions are meritorious, so we affirm.

**DISCUSSION**

In light of the nature of the issues raised in this appeal, we will address the facts and evidence as necessary in conjunction with the specific issues to which they pertain.

1

## I. Competency

Defendant raises two distinct issues concerning his competence to stand trial. He contends that, during his competency trial, the court erroneously permitted the prosecutor to cross-examine an expert psychiatric witness about the possible legal consequences of a finding that he was mentally incompetent to stand trial. He asserts the challenged questions suggested to the jury that if he were found incompetent he could evade punishment for his crimes, and therefore were unduly prejudicial. Defendant also argues the court erred when it later refused to hold a second competency hearing after he threatened, and allegedly attempted, to kill himself on the eve of trial. Neither contention is persuasive.

### A. Cross-Examination of Dr. Solomon

#### i. *Background*

The court appointed two psychologists to evaluate defendant after his attorney declared a doubt about his competency. Psychologist Allan Solomon interviewed defendant for about 45 minutes. He neither reviewed defendant's psychiatric records nor administered any psychological tests, and could not recall at trial whether he read defendant's police reports. Dr. Solomon concluded defendant was not competent to stand trial, "does not understand the seriousness of the current charges, and cannot assist counsel in forming an adequate defense as he firmly denies any memory of the preceding events. . . . . Based on the current examination, the defendant is judged to be a danger to himself and to others. The defendant is judged most likely to be suffering from a psychotic disorder, possibly Schizoaffective Schizophrenia, and will require long term treatment."

Psychologist Paul Good also evaluated defendant. Prior to interviewing defendant he spoke with the prosecution and defense counsel and reviewed the order authorizing the evaluation, the police reports, the information, and Dr. Solomon's report. He then interviewed defendant and administered a battery of psychological tests.

2

Dr. Good's observations and conclusions diverged markedly from Dr. Solomon's. He observed that defendant claimed to have continual suicidal thoughts, auditory hallucinations, and no memory of his alleged crimes, yet he was able to provide a detailed personal history, his long-term memory was intact, and his thought process seemed concrete. The interview "was notable in terms of [defendant's] inconsistency. He gave a reasonably coherent social history, revealing a capacity to recall some memories as a child with his family and at school, memories of violent experiences growing up in Richmond, memories of dropping out of high school, of working with his father and for a company called Bay Area Tree Care, memories of two serious girlfriends, recollections of his brother's death due to Hepatitis, his own suicide gesture, and one or two psychiatric hospitalizations. He even recalled that he had been convicted and incarcerated for a DUI at 21 years of age, and then sent to DUI school. *How is it possible for this man to remember so much of his personal history, including recalling his DUI offense, but to have absolutely no recollection of the numerous crimes for which he has been charged, and which stretch out over three years?*" Dr. Good also observed that defendant was able to engage in goal-directed behavior evidenced by his lying to police and invoking his Miranda rights when arrested.

On the basis of his interview and defendant's results on six psychological tests, Dr. Good concluded defendant was malingering. "Overall, it may be that [defendant] has a severe mental illness, but whatever it is, he is now feigning ignorance of the legal process and exaggerating his psychotic symptomatology. He is not presenting himself in a genuine manner. [¶] **Based on these findings, it is my opinion that [defendant] has more ability than he projects, and should be considered competent to be adjudicated at the present time.**"

Both psychologists testified at the competency trial. On cross-examination, the prosecutor asked Dr. Solomon whether there would be "very heavy implications" if an incompetent defendant were wrongly found competent and forced to go to trial. Dr.

3

Solomon agreed there would be.  But, the doctor did not agree with the proposition that there were also "potentially serious consequences" if a competent defendant were erroneously adjudged *in*competent.  "I don't agree with that, no.  Because . . . in fact I think it's the other way around.  If they are judged incompetent, I think what should happen – and I know this doesn't – what should happen is the person should be, you know, placed in some kind of mental health facility where they can be observed for an extensive period of time, perhaps try him on medication, and have a much more extensive evaluation, and then competence could be established.  And  that's, you know, usually what happens in that case."  Dr. Solomon did not think the downside of misdiagnosing a competent person to be incompetent "is that severe, you know, really.  I mean, I think, you know, at wors[t] they continue to be evaluated."  Pressed to explain, the doctor said there was "very little" downside to a false diagnosis of incompetence.  "[I]t could . . . delay a court process.  That's unfortunate.  But in terms of --- that's about the only downside I see."

Dr. Solomon said he was not qualified to say whether there might be other adverse consequences of a misdiagnosis.  He did not know whether causing a delay in the proceedings could be an incentive for a defendant to feign incompetency.  He agreed that delay might benefit a defendant, but thought that possibility was "very speculative" with regard to this case.

The prosecutor asked Dr. Solomon if he knew what happens if a defendant found to be incompetent is not restored to competency after three years.  Outside the jury's presence, defense counsel objected that the prosecutor was trying to suggest to the jury that defendant could go free after three years if he were found incompetent.  The prosecutor argued that the question went to Dr. Solomon's bias.  "He said there's no downside for finding someone – there's very little downside for finding someone incompetent who's not, and so I think that goes to his bias as to create a tendency to err

4

on the side of finding incompetency.  So I think questioning him as to the consequences of what would happen and his familiarity with those, are proper scope."

The court agreed that Dr. Solomon's testimony supported a fair inference of a bias toward finding a defendant incompetent "because there's no downside."  The court allowed limited questioning to explore the apparent bias.  "I will allow you to ask very targeted questions, not open-ended questions, because I don't want this to be – this case to be hijacked into what he thinks, what his opinion is at Napa, and how quickly things happen, but if you have very targeted cross-examination questions that go to either his bias or lack of understanding of the consequences of the decision he's making on the one hand, or to the defendant's motive to malinger, you can ask specific questions related to those two issues."

The prosecutor asked Dr. Solomon whether a defendant might be motivated to fake incompetence to delay the criminal proceedings, and elicited his acknowledgment that delay might benefit a defendant because witnesses could die or disappear or their memories could fade.  But, Dr. Solomon replied that "I don't think we're talking about the facts of this particular case.  This is very speculative."

The prosecutor then asked Dr. Solomon if he was aware a defendant could be placed in a conservatorship or the charges against him could be dropped if he successfully feigned incompetency for three years.  The doctor said he did not know the "letter of the law on that," but agreed with the prosecutor that this could possibly be an incentive to feign incompetence in the "very abstract."  Again, he added that "[i]t just seems so unlikely" and "beyond the realm of speculation."  Later, the prosecutor posed a final question:  "[N]ot going to prison is an incredibly powerful motivation to lie, wouldn't you agree?"  Dr. Solomon agreed that it is.

Doctor Good testified after Dr. Solomon.  He opined that defendant might have a mental illness, but that he appeared to be exaggerating his symptoms and was competent to stand trial.  After brief deliberations, the jury found defendant competent.

5

**ii. *Analysis***

Defendant contends the court abused its discretion when it allowed the prosecutor to question Dr. Solomon about the consequences should the jury find defendant incompetent to stand trial. He argues that these questions were of no or little probative value, and were highly prejudicial because they insinuated that defendant could escape punishment if he were found incompetent. We will not disturb a trial court's exercise of discretion in balancing probative value against potential prejudice unless it " 'exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) Here, it did not.

The prosecutor's questions bore directly on Dr. Solomon's view that, while finding an incompetent defendant competent to stand trial carries severe consequences, an erroneous finding of *in*competence has little downside. Accordingly, the challenged questions were highly relevant to exploring the doctor's apparent bias toward resolving questions about competency in favor of finding defendant unfit to stand trial. (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1165, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [prosecutor was entitled to expose expert witness's bias through questions exploring his "propensity to advocate for criminal defendants even in extreme cases"].) The prosecutor's questions were also relevant to whether Dr. Solomon understood that defendant might have a motive to malinger, a point on which he and Dr. Good diverged. Thus, in light of Dr. Solomon's apparent bias, the questions had probative significance.

Nor were these questions unduly prejudicial. " 'Prejudice' as contemplated by section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue*

6

prejudice. Unless the dangers of undue prejudice, confusion, or time consumption

' "substantially outweigh" ' the probative value of relevant evidence, a section 352

objection should fail. [Citation.] ' "The 'prejudice' referred to in Evidence Code section

352 applies to evidence which uniquely tends to evoke an emotional bias against the

defendant as an individual and which has very little effect on the issues. In applying

section 352, 'prejudicial' is not synonymous with 'damaging.' " (*Vorse v. Sarasy* (1997)

53 Cal.App.4th 998, 1008.)  Here, although the challenged questions were highly relevant

to the validity of Dr. Solomon's opinion, the court allowed only limited questions

targeted to show his bias or his failure to recognize defendant's motive to malinger.

Although the questions were quite likely damaging to Dr. Solomon's credibility, they

were not unduly prejudicial.

## B. Denial of a Second Competency Evaluation

### i. *Background*

Four months after the competency verdict, on what was to be the first day of trial,

defendant moved for a new attorney and then, when the court denied his *Faretta*[1] motion

as untimely, sought to represent himself.  The court commented that defendant was either

trying to engineer a last-minute delay or, if he had been unaware of his trial date as he

claimed, he was too impaired to represent himself.  Defendant responded to the denial of

his motions by threatening to hang himself or "slice my vein."

The case was called for jury trial that afternoon.  At the time, defendant was being

evaluated following his suicide threat and an ineffectual suicide attempt.  The next

morning the court stated that defendant was being held in a safety cell as a result of his

attempts to injure himself.  Subpoenas had been served on the jail and on defendant's

mental health providers to inquire into defendant's status.  Rather than declare ready for

---

[1] *Faretta v. California* (1975) 422 U.S. 806.

trial, defense counsel declared a doubt as to defendant's competence and urged the court to suspend the proceedings and appoint an expert to reassess his ability to stand trial.

The court reviewed the transcripts of defendant's *Marsden*[2] and *Faretta* hearings, the jail's incident reports on defendant's attempts to injure himself, and his medical records from before and after the competence trial.  After entertaining arguments from both parties, the court denied defendant's request for a second competence assessment.  It explained: "[I]n this case we had a hearing, and in looking at the medical records, it's clear that there had been ideations of suicides discussed by the mental health professionals prior to his hearing [*sic*] jury trial where he was found to be competent to stand trial.  [¶] The issue is whether he's capable of understanding the nature and purpose of the proceedings that he must comprehend his own status and condition in reference to the proceedings, and he must be able to assist his attorney in conducting a defense or to be able to conduct his own defense in a rational manner. [¶] I don't see anything that's changed in terms of the evidence before me.  There's been no substantial change or evidence of a substantial change.  It's just been his conduct in the last two days since his motion for continuance is denied, his motion to have new counsel was denied, his motion to represent himself was denied.  [¶] I don't see any evidence of any change. He's been taking the same medications all along.  And that's always a factor, if the medications had changed, leading to a substantial change in his condition.  I don't find anything of that nature.  [¶] Therefore I am . . . going to deny the defense request for another medical evaluation or mental evaluation.  I'm satisfied that his condition remains the same with regard to his ability to be competent to stand trial . . . ."

**ii.  *Analysis***

The court is required to suspend criminal proceedings and hold a competency hearing if there is substantial evidence a defendant may be incompetent to stand trial.

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

(Pen. Code, § 1368; *People v. Howard* (1992) 1 Cal.4th 1132, 1163; *People v. Medina* (1990) 51 Cal.3d 870, 882.) "[E]ven though section 1368 is phrased in terms of whether a doubt arises in the mind of the trial judge and is then confirmed by defense counsel . . . once the accused has come forward with *substantial evidence* of incompetence to stand trial, due process *requires* that a full competence hearing be held as a matter of right. . . . [¶] 'Substantial evidence' has been defined as evidence that raises a reasonable doubt concerning the defendant's competence to stand trial." (*People v. Welch* (1999) 20 Cal.4th 701, 737-738; *Howard, supra*, at p. 1163.)

Defendant contests the court's decision not to hold a *second* hearing to determine whether he remained competent. "When, as here, a competency hearing has already been held and the defendant was found to be competent to stand trial, a trial court is not required to conduct a second competency hearing unless 'it "is presented with a *substantial change of circumstances or with new evidence*" ' that gives rise to a 'serious doubt' about the validity of the competency finding. [Citation.] More is required than just bizarre actions or statements by the defendant to raise a doubt of competency. [Citations.] In addition, a reviewing court generally gives great deference to a trial court's decision whether to hold a competency hearing. As we have said: ' "An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper." ' " (*People v. Marshall* (1997) 15 Cal.4th 1, 33, italics added; accord, *People v. Marks* (2003) 31 Cal.4th 197, 220.) We review whether the determination not to hold a second competency hearing was supported by substantial evidence. (*People v. Huggins* (2006) 38 Cal.4th 175, 220.)

Here, defendant's contention that the evidence mandated a second competence hearing fails for the reasons discussed in *People v. Huggins, supra,* 38 Cal.4th at page 220. There, defense counsel expressed concerns about his client's competence at the start of the penalty phase, several years after the prior competency proceedings.

9

(*Ibid.*)  The Supreme Court explained, "Although the fact of the prior competency determination did not by itself establish defendant's competency . . . a second competency hearing was required only on a showing of a substantial change of circumstances or new evidence casting a serious doubt on the validity of the prior finding [citation].  The prior finding was based on a thorough inquiry into defendant's competency, and the evaluations made at that time and the verdict of competency must be viewed as a baseline that, absent a preliminary showing of substantially changed circumstances, eliminated the need to start the process anew."  (*Ibid.*)

The Supreme Court made this point also in *People v. Weaver* (2001) 26 Cal.4th 876, where it wrote:  "[D]efendant fails to mention an important fact critically undermining his claim:  the trial court had already declared a doubt as to defendant's competence at the time of the arraignment, had suspended proceedings, and had defendant examined by two psychiatrists.  The parties submitted the matter, and the trial court found defendant legally competent.  'Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence.' "  (*Id.* at p. 954.)

There was no such evidence here.  As support for his request, defendant identifies only his suicide threats and attempts to harm himself in jail.  But, as the trial court observed, this was not a new development.  Defendant told Dr. Solomon that a friend stopped him from jumping off a freeway overpass about five years earlier, and he had been hospitalized for suicidal thoughts "a few times" prior to his arrest.  Moreover, defendant's suicide threats and attempts to harm himself did not, without more, indicate that he was incapable of understanding the proceedings or assisting in his own defense. (See *People v. Ramos* (2004) 34 Cal.4th 494, 509.)  Finally, given Dr. Good's earlier diagnosis of malingering and the suspicious timing of defendant's suicidal threats and behavior immediately after the court denied his *Marsden* and *Faretta* motions, the trial

court could readily credit the prosecutor's argument that defendant was simply "attempting to gain a continuance by any means necessary." The record supports the court's ruling.

## II. Severance

Defendant contends the trial court abused its discretion when it denied his motion to sever the counts arising from his assault on 16-year-old Doe 3 from those related to his other victims. Here too, we disagree.

Under Penal Code section 954, "[a]n accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." In this case, the statutory requirements for joinder were satisfied because the charges for all of the victims involved kidnapping and sexual assault. (See *People v. Maury* (2003) 30 Cal.4th 342, 395; *People v. Bradford* (1997) 15 Cal.4th 1229, 1315.) Therefore, defendant can establish error only upon a showing of prejudice so substantial as to require severance when balanced against the state's strong interest in the efficiency of a joint trial. (*People v. Vines* (2011) 51 Cal.4th 830, 855; *People v. Arias* (1996) 13 Cal.4th 92, 126; see also *Frank v. Superior Court* (1989) 48 Cal.3d 632, 639-640 ["[t]rial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials"].)

" 'The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually

11

likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns into a capital case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 172-173.)

But these four criteria are not equally significant. " '[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible . . . in separate trials on the others. *If so, any inference of prejudice is dispelled.*' " (*People v. Osband* (1996) 13 Cal.4th 622, 667, italics added; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 721; *Frank v. Superior Court, supra,* 48 Cal.4th at p. 639.)

That is the situation here. Indeed, defendant concedes the evidence was at least "minimally" cross-admissible under Evidence Code section 1108, [3] which allows the prosecution to introduce evidence of prior sex offenses in a criminal action for a present sex offense unless it is inadmissible under section 352. His argument, rather, is that if the charges were tried separately, evidence of his assault on Doe 3 would have likely been excluded under section 352 in an exercise of the court's discretion because the victim was only 16 years old, her family knew and trusted defendant, and, unlike the other victims, she had no history of drugs or prostitution. In light of these factors, he asserts, evidence of his crimes against Doe 3 would be unduly prejudicial if admitted in a trial of his offenses against his other four victims, and, therefore, was not cross-admissible.

The trial court was unpersuaded. "[T]rying the charges involving the 16 year old would be prejudicial against the defendant, but all evidence that's evidence of a charge is

_____

[3] "(a) In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108.) Unless otherwise noted, further statutory references are to the Evidence Code.

12

prejudicial. The question is whether the prejudice is the type that is not allowed and whether the prejudice is outweighed by—or outweighs the probative value. [¶] In this case, I believe the probative value and full measure of all the balance will fall in favor of counsel to proceed . . . ." That conclusion was well within its discretion. Doe 3 was three months shy of her seventeenth birthday, but she was not much younger than 19-year-old victim Doe 4, or 22-year-old victim Doe 2. As the prosecution observed, "It is not as [though] the defendant raped all adults and then a five year old child, most of his victims were young women." Defendant also argues that Doe 3, the only victim without prior involvement in drugs or prostitution, was more credible than his other victims, so evidence about his assault on her would have an "improper spillover effect" on the other counts. But there was extremely compelling evidence of defendant's offenses against his other victims, including the fact that he was pulled over and arrested in the act of holding Doe 4 captive in his truck, and he was linked to the rapes of Does 1, 2, and 5 through DNA evidence. In this situation, it defies credulity to posit the jury would not have convicted defendant for offenses against those other victims had it not heard Doe 3's testimony about her own ordeal. The court appropriately denied defendant's severance motion.

### III. Consecutive Sentencing

#### A. Background

The jury convicted defendant of three counts of kidnapping for purposes of sexual assault, one count of false imprisonment, nine counts of forcible oral copulation, three counts of sexual penetration by a foreign object, four counts of forcible rape, two counts of forcible sodomy, and three counts of second degree robbery. In addition, the jury found true a number of enhancements for weapons, kidnapping, and multiple victims. The court sentenced defendant to 521 years to life in prison, including 17 consecutive terms of 25 years to life for sexual assaults aggravated pursuant to Penal Code section 667.61. The court explained its sentencing decision: "Mr. Caldera, I listened to the

13

evidence in this matter.  This is one of the most horrific cases I've heard in my career as a judge.  The things you've done to five separate wom[e]n over a five- to six-year period are just abominable.  I've never sentenced anyone to this much time in prison, but I am doing this for you because you should not ever be out on the streets again to harm the women of this state and out of this country.  [¶] You're a dangerous person.  You stole their sense of privacy, their sense of integrity, of being a person who could walk safely and do the things they wanted to do in life.  And you took that from them.  They can never get that back.  [¶] . . . [¶]  Horrific acts.  We query the practicality of challenging these terms, since even complete vindication of these claims would only reduce defendant's sentence to 396 years to life.  But he cannot claim even that Pyrrhic victory.  The evidence supports the court's decision to impose consecutive terms for each count, so we will not disturb the sentence.

## B. Legal Principles

Under Penal Code section 667.6, a defendant convicted of multiple sex offenses against the same victim on the same occasion must be sentenced to consecutive terms for each violation "if the crimes involve separate victims or involve the same victim on separate occasions.  [¶] In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (Pen. Code, § 667.6, subds. (d),  (e).)

The Supreme Court analyzed the meaning of "separate occasions" in this context in *People v. Jones* (2001) 25 Cal.4th 98, 104-105.  "Under the broad standard established by Penal Code section 667.6, subdivision (d), the Courts of Appeal have not required a

14

break of any specific duration or any change in physical location. Thus, the Court of Appeal herein cited *People v. Irvin* (1995) 43 Cal.App.4th 1063, 1071 . . . for the principle that a finding of 'separate occasions' under Penal Code section 667.6 does not require a change in location or an obvious break in the perpetrator's behavior: '[A] forcible violent sexual assault made up of varied types of sex acts committed over time against a victim, is not necessarily one sexual encounter.' Similarly, the Court of Appeal in *People v. Plaza* (1995) 41 Cal.App.4th 377, 385 . . . affirmed the trial court's finding that sexual assaults occurred on 'separate occasions' although all of the acts took place in the victim's apartment, with no break in the defendant's control over the victim. (But see *People v. Pena* (1992) 7 Cal.App.4th 1294, 1316 . . . [defendant's change of positions between different sexual acts was insufficient by itself to provide him with a reasonable opportunity to reflect upon his actions, 'especially where the change is accomplished within a matter of seconds']; *People v. Corona* (1988) 206 Cal.App.3d 13, 18 . . . [holding, after the respondent implicitly conceded the point, that the trial court erred in imposing consecutive sentences for different sexual acts when there was no cessation of sexually assaultive behavior 'between' acts].)"

Our review of the trial court's finding that a defendant committed offenses on separate occasions is deferential. We may reverse the court's finding "only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)

**C. Analysis**

**i. *Does 1 and 2***

Defendant was convicted of two counts of forcible oral copulation, two counts of forcible penetration, and one count of forcible rape of Doe 1, for which he received five consecutive terms of 25 years to life. He argues these offenses took place on, at most, three, not five, "separate occasions." He was convicted of two counts of forcible oral

15

copulation and one count of forcible sexual penetration of Doe 2 and sentenced to three consecutive 25 years to life terms, but similarly asserts his assault on Doe 2 occurred on, at most, two "occasions." Not so. The evidence supports the trial court's conclusion that each of these counts warranted a consecutive term.

Defendant assaulted Doe 1 and Doe 2 on the same night. Both were working as prostitutes when he and another man picked them up. After the four of them engaged in a consensual sexual encounter at a motel, defendant pulled out a shotgun and forced both women to participate in a series of nonconsensual sexual acts. Doe 1 testified that she was forced to orally copulate defendant at least three times. He first made her undress and put on Doe 2's panties. Then he made her orally copulate him, then raped her. Over the next half-hour, defendant alternated between raping Doe 1 and then "flip[ping her] over" and penetrating her anus with his fingers. He did this "multiple times." After about 30 minutes, defendant forced Doe 2 to orally copulate him while he put his fingers in Doe 1's anus. Next, he forced Doe 1 to orally copulate him again while he put his fingers in Doe 2's vagina. Defendant "switched" back and forth like this between the two women more than once. After he stopped this "switch[ing]," defendant demanded money from the women, threatened them with his gun, and made a phone call. Then he again forced Doe 1 to perform oral sex and, finally, made her get on her knees and raped her vaginally from behind.

Registered nurse Katherine Stidwell performed sexual assault examinations on Doe 1 and Doe 2 the next morning. Doe 1 told Stidwell that defendant penetrated her vagina with his penis 15 times and with his finger 10 times, penetrated her anus with his finger twice, and unsuccessfully attempted to penetrate her anus with his penis. Doe 2 told Stidwell that defendant forced her to orally copulate him more than six times.

The trial court expressly found that each of the charged offenses as to Does 1 and 2 were separate acts, "with the defendant having time to pause and reflect before making a decision to commit the next act." The evidence supports those findings. Defendant

16

claims he had no opportunity to reflect between the first time he forced Doe 1 to orally copulate him, then raped her, and then repeatedly penetrated her anus with his finger, because "there is no evidence that [he] left the bed or did or said anything in between those acts." He contends for the same reason that he had no opportunity to reflect between forcing Doe 2 to orally copulate him and then digitally penetrating her while he forced Doe 1 to take her place orally copulating him. But such evidence is not dispositive; all that is required is a reasonable opportunity to reflect on his actions before he resumed his sexual assault. (Pen. Code, § 667.6, subd. (d); *People v. Irvin, supra,* 43 Cal.App.4th at pp. 1070-1071 ["a forcible violent sexual assault made up of varied types of sex acts committed over time against a victim, is not necessarily one sexual encounter"].) The trial court could reasonably find defendant had that opportunity, and nonetheless proceeded to commit further assaults on his victims. (See *People v. Garza*, *supra*, 107 Cal.App.4th at p. 1092.)

### ii. *Doe 3*

Defendant was convicted of two counts each of rape and forcible oral copulation against Doe 3, for which he was sentenced to four consecutive terms of 25 years to life. Again, he contends these assaults constituted only two "separate occasions" of sexually assaultive conduct. Again, the trial court could reasonably conclude otherwise.

Defendant overpowered Doe 3 in a motel room, undressed her, and raped her. When Doe 3 then went to the bathroom, defendant followed her and wiped her menstrual blood off of his penis. They then returned to the bedroom, where defendant forced Doe 3 to orally copulate him. There was testimony that defendant took Doe 3 from the bed to the bathroom four times, where he would wipe himself off with a towel. Each time they returned from the bathroom to the bedroom, he raped her again. He also made her orally copulate him four times, alternating between penetrating her mouth and her vagina with his penis. The evidence that defendant took the time to go into the bathroom and clean himself between each incident of oral copulation followed by rape supports the court's

17

determination that the counts occurred on separate occasions. The court reasonably concluded on the basis of this evidence that each of the charged offenses was committed on a "separate occasion" within the meaning of section 667.6, subdivision (d), and so correctly imposed consecutive terms on the challenged counts.

## DISPOSITION

The judgment is affirmed.


_____
Siggins, J.


We concur:


_____
McGuiness, P.J.


_____
Pollak, J.